**Joseph J. WALLERS, Clara J. Wallers, Arthur R. Fortier and Loretta Fortier, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**87–1895.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1988.

Decided May 27, 1988.

---

Richard T. Cubbage, Evanston, Ill., for plaintiffs-appellants.

B. Paul Klein, Appellate Sec., Tax Div. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, and CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

Joseph Wallers and Arthur Fortier, retired railroad employees, ask us to consider whether the manner of taxing their railroad retirement benefits violates their equal protection rights. In 1983, Congress imposed an income tax on railroad retirement benefits, which had long enjoyed tax-

exempt status. The taxpayers do not contest the taxation of benefits labeled "Tier I." These payments are taxed in a fashion identical to social security benefits because the Tier I payments are the same as the benefits the railroad retirees would be receiving under the social security system had they not worked for a railroad and therefore been covered by social security. "Tier II" benefits, constituting the excess of total railroad retirement benefits over Tier I benefits, are taxed as private pensions, with respect to which all but the income represented by the retirees' own contributions is taxed. Wallers and Fortier charge that the tax on Tier II benefits is unconstitutional because it violates equal protection. The district court rejected this claim and, on cross-motions for summary judgment, ruled in favor of the government. We affirm.

I.

Wallers and Fortier began working for the Chicago, Burlington & Quincy Railroad in 1923 and 1937, respectively. In 1937, Congress bifurcated the federal old age insurance program between the social security system and the railroad retirement system.[1] Wallers and Fortier, as railroad employees, participated in the railroad retirement program, while non-railroad employees were placed in the social security system. Until 1974 railroad retirement benefits were funded through payroll taxes paid in equal amounts by employers and employees. The applicable payroll tax rate was consistently higher than the social security payroll tax rate. As a consequence, Wallers and Fortier upon retirement in

---

1. The basic structure of the railroad retirement system is described in the legislative history of the Act:

The railroad retirement system is the Federally administered retirement system for railroad employees. The basic railroad retirement benefit consists of two components or "tiers"....

A minimum of ten years of railroad service is required for eligibility for railroad retirement benefits. Everyone eligible receives both Tier I and Tier II....

Basic benefits are paid from, and revenues paid to, the Railroad Retirement Account, a trust fund....

....
Tier I is designed to be equivalent to social security.

....
Tier II is a benefit in addition to Tier I. It represents an amount in addition to what a Social Security recipient in similar circumstances would receive. It is thus analogous to a private employer paid pension received by a person in another industry.

H.R.Rep. No. 30, 98th Cong., 1st Sess., pt. I, at 14–18, *reprinted in* 1983 U.S.Code Cong. & Admin.News 729, 730–34.

1971 and 1975, respectively, received greater benefits than non-railroad retirees who had earned the same income.

In 1974, the railroad retirement system was divided into two programs. The Tier I program became the equivalent of social security. It taxes railroad employers and employees at the social security tax rate and distributes retirement benefits equal to those distributed by social security. Railroad retirees receive additional benefits under the Tier II program, which, from 1974 to 1981, was financed by payroll taxes paid solely by employers. Since 1981, railroad employees have been required to pay a small percentage of their income to the Tier II program.[2]

All railroad retirement and social security benefits were tax exempt until Congress passed the Railroad Retirement Solvency Act of 1983 (the "Act" or the "Solvency Act"), Pub.L. No. 98–76, 97 Stat. 411 (codified in scattered sections of 26 U.S.C., 42 U.S.C. and 45 U.S.C.), in an effort to raise what it determined was much-needed revenue for the railroad retirement program. One feature of the Act is the imposition of an income tax on railroad retirement benefits. Tier I benefits are taxed in the same manner as social security benefits. At most, only one-half both of Tier I and of social security benefits are subject to tax, and Tier I and social security benefits are exempt from tax for individuals with an adjusted gross income of less than $25,000 and for married couples with an adjusted

gross income under $32,000.[3] 26 U.S.C. § 86(a)–(d). Tier II benefits, however, are taxed as qualified private pensions.[4] Except to the extent they represent the taxpayers' own contributions, all Tier II benefits are taxed. *See infra* pp. 1284–1285.

For the 1984 tax year, Wallers and Fortier were required to pay taxes on their Tier II benefits. They each filed a claim for refund, which the IRS denied. They then filed suit in the district court, complaining that the tax on Tier II benefits "is discriminatory and unlawful." The district court held that the tax does not violate equal protection and granted summary judgment for the government.[5] We affirm.

## II.

On appeal, the taxpayers argue that the method of taxing railroad retirement benefits violates the equal protection guarantees inherent in the fifth amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *United States v. Falk*, 479 F.2d 616, 618 (7th Cir.1973). They specifically contend that the Solvency Act discriminates against railroad retirees by denying them the income tax exemption for Tier II benefits that it allows for Tier I and social security benefits,[6] and by taxing all of their Tier II benefits while taxing only fifty percent of Tier I and social security benefits.

As an initial matter, Wallers and Fortier must show that recipients of Tier II

---

2. From 1981 through 1984, railroad employers paid Tier II payroll taxes at a rate of 11.75%. During the same period, railroad employees were required to pay Tier II payroll taxes at a 2% rate. *See* 26 U.S.C. § 72(r)(2)(B)(ii).

3. A retiree is taxed on the lesser of (1) one-half of his Tier I or social security benefits, or (2) one-half of the amount by which his adjusted gross income exceeds $32,000 (if he is married). Only fifty percent of Tier I and social security benefits are includable in adjusted gross income. *Id.* § 86(a)–(d).

4. Section 72(r)(1) of the Internal Revenue Code expresses the intent of Congress to treat Tier II benefits as qualified private pensions under section 401(a):
 Notwithstanding any other provisions of law, any benefit provided under the Railroad Retirement Act of 1974 (other than Tier I rail-

road retirement benefits) shall be treated for purposes of this title as a benefit provided under an employer plan which meets the requirements of § 401(a).
 *Id.* § 72(r)(1).

5. The parties have agreed that there are no genuine issues of material fact. Thus, we must decide whether the district court properly ruled that the government is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

6. Wallers and Fortier believe that Tier II benefits should be taxed only if a retiree's income exceeds $25,000 (if he is single) or $32,000 (if he is married).

benefits as a class have been disfavored in comparison with similarly situated taxpayers. *Rostker v. Goldberg,* 453 U.S. 57, 78–79, 101 S.Ct. 2641, 2658–59, 69 L.Ed.2d 478 (1981); *Rinaldi v. Yeager,* 384 U.S. 305, 309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966); *Desris v. City of Kenosha,* 687 F.2d 1117, 1119 (7th Cir.1982), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983). In this connection, Wallers and Fortier urge that denial of the claimed income tax exemption for Tier II benefits puts railroad retirement recipients at a disadvantage with respect to social security recipients. For example, a married retiree whose total retirement income is less than $32,000 does not pay taxes on social security benefits; but a married railroad retiree with the same (relatively low) income is taxed on the portion of the income categorized as "Tier II."

We are not persuaded that railroad retirees suffer a real disadvantage in relation to social security retirees. Instead, in many respects, railroad retirees remain favored over non-railroad retirees. Despite the Tier II tax, railroad retirees continue to receive and retain greater benefits than social security retirees who earned the same income while they were working. Moreover, the tax treats railroad retirees the same as retirees who receive a private pension in addition to social security. Thus, Tier I benefits are taxed like social security benefits, and Tier II benefits are taxed like private pensions.

■ In any event, even if Wallers and Fortier have shown a discriminatory tax treatment of railroad retirement benefits, it does not necessarily follow that principles of equal protection have been violated. When reviewing allegedly discriminatory legislative classifications that do not burden fundamental rights or discriminate against suspect classes, the Supreme Court has consistently upheld classifications that are rationally related to a legitimate governmental purpose. *See, e.g., Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440,

105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985); *Regan v. Taxation With Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). In examining the tax imposed by the Solvency Act, our inquiry is thus twofold. We must determine whether the governmental purpose is legitimate and whether the classification drawn is rationally related to that purpose. We must keep in mind, of course, that Congress has "especially broad latitude in creating classifications and distinctions in tax statutes." *Regan,* 461 U.S. at 547, 103 S.Ct. at 2002.

We conclude first that Congress has a legitimate purpose in taxing railroad retirement benefits. At stake is the economic future of the railroad retirement system. This is unquestionably a valid governmental interest. *See United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980). The express purpose of the Act is "to ensure the solvency of the railroad retirement system and prevent large benefit cuts to one million retirees." H.R.Rep. No. 30, 98th Cong., 1st Sess., pt. I, at 14, *reprinted in* 1983 U.S.Code Cong. & Admin.News 729, 730.[7] Indeed, the insolvency of the railroad retirement system would cause thousands of railroad retirees to lose the benefits upon which they are totally dependent. The welfare of these and future retirees is clearly a legitimate governmental interest.

Wallers and Fortier, nonetheless, contend that the railroad retirement trust fund was never in jeopardy. To support this argument, they note that revenues from taxes on Tier II benefits are to be allocated to the trust fund only until October 1, 1988, and that, in any event, the trust fund transfers some of its assets to the railroad unemployment insurance fund. They suggest that, if the crisis were truly as serious as

---

7. In addition, "[t]he net effect of this legislation will be a significant reduction (over $9 billion) in the budget deficit over ten years." H.R.Rep. No. 30, 98th Cong., 1st Sess., pt. I, at 14, *reprinted in* 1983 U.S.Code Cong. & Admin.News 729, 730.

portrayed, the Tier II tax revenues would be allocated permanently to the trust fund, and Congress would not require the trust fund to continue to transfer money to the unemployment insurance fund.

There was, however, considerable evidence before Congress to suggest that the railroad retirement system was imminently threatened by insolvency and that additional revenues were sorely needed. The crisis, although perhaps temporary, was real and required a response. The House Energy and Commerce Committee predicted that without quick action one million retirees would face a forty percent reduction in their Tier II benefits. *Id.* at 33, *reprinted in* 1983 U.S.Code Cong. & Admin.News at 749. The source of the financial crisis was the decline in railroad employment. As the number of retirees increased, the number of active railroad employees decreased, making it difficult to fund the largely "pay-as-you-go" program. In fact, railroad employment declined from 510,000 in August 1981 to 388,000 by January 1983 and was expected to decline further.[8] *Id.* at 24–26, *reprinted in* 1983 U.S.Code Cong. & Admin.News at 740–42.

Congress therefore was justified in its efforts to rescue the railroad retirement system. To this end, Congress proposed several solutions, including an increase in the payroll tax, a reduction of retirees' benefits and, ultimately, the imposition of income taxes on the two tiers of railroad retirement benefits.[9]

The next question is whether taxing Tier II benefits differently from Tier I and social security benefits is rationally related to ensuring the solvency of the railroad retirement system. Whether taxing Tier II benefits differently from Tier I benefits is the "best" solution is not for us to decide. Congress, not the judiciary, is "the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems." *Schweiker,* 450 U.S. at 230, 101 S.Ct. at 1080. We need only determine whether there is a rational basis for the differential tax treatment. We conclude that there is.

The tax on Tier II benefits, of course, provides considerable revenue to the railroad retirement system. It has been estimated that taxing Tier II benefits would raise $50 million in 1984, $171 million in 1985 and $785 million over a five-year period. H.R.Rep. No. 30, 98th Cong., 1st Sess., pt. II, at 51, *reprinted in* 1983 U.S.Code Cong. & Admin.News 813, 842. In contrast, the tax on Tier I benefits was projected to provide less than half as much during the same period of time.[10] Clearly, the Tier II tax provides significantly more revenue than it would have if it had been treated like social security. Thus, revenue from taxes on Tier II benefits contributes meaningfully to resolving the railroad retirement program's financial crisis.[11]

Finally, taxing Tier II benefits more heavily than Tier I and social security benefits promotes equity by placing the burden of saving the railroad retirement system on recipients of its benefits without penalizing them merely for having worked for a railroad. Thus, a railroad retiree's Tier I income (which represents the amount he

---

8. The government also notes that financial support to the railroad retirement system was exacerbating the federal deficit. Direct federal appropriations were estimated to have accounted for 6.2% of the retirement program's revenue. In addition, the tax exemption for railroad retirement benefits cost the government an estimated $2.6 billion in potential revenue per year. Brief for the Appellee at 15–16 (citing Congressional Budget Office, *The Railroad Retirement System: Benefits and Financing* 10, 19–20 (1981)).

9. Congress also increased the Tier II payroll tax rate for employers and employees by 3% and 2.25%, respectively, over a three-year period.

10. The House Ways and Means Committee estimated that revenue from taxing 50% of Tier I benefits for certain high income retirees would be $20 million in 1984, $64 million in 1985 and $341 million for a five-year period. H.R.Rep. No. 30, 98th Cong., 1st Sess., pt. II, at 51, *reprinted in* 1983 U.S.Code Cong. & Admin.News 813, 842.

11. Moreover, this revenue helps reduce the federal deficit, especially after 1988 when it will be directed to the United States Treasury rather than to the railroad retirement system.

would be receiving if he had worked for a non-railroad employer) is taxed at the same rate and is subject to the same exemption as social security income. Because of Tier II, a railroad retiree still receives a larger annuity than does a comparable social security recipient (that is, one who, as an employee, earned the same income as the railroad employee). The Tier II tax simply reduces somewhat the advantage of the railroad retiree.[12] Moreover, Congress' method of taxing Tier II benefits treats railroad retirees the same as millions of other retirees who receive social security benefits and, in addition, pensions from their employers. Social security recipients who receive retirement pensions from their employers are fully taxed on those pensions, and Tier II benefits are taxed in the same manner.

We thus conclude that the income tax classification drawn between Tier II benefits and Tier I and social security benefits does not violate the equal protection guarantees inherent in the fifth amendment; this is a reasonable classification rationally related to the legitimate congressional purpose of ensuring the solvency of the railroad retirement system.

### III.

 Wallers and Fortier contend that, even if the tax on Tier II benefits is constitutional, they should be taxed only on the portion of Tier II benefits attributable to employer contributions. Because Wallers and Fortier raise this specific argument for the first time on appeal, we need not address it. *See Libertyville Datsun Sales v.*

*Nissan Motors Corp.*, 776 F.2d 735, 737 (7th Cir.1985).

 Fortunately for these taxpayers, their waiver of this argument does not necessarily leave them in the position of having to pay taxes on *all* of their Tier II benefits. The Code clearly does not purport to tax the portion of Tier II payments that represent a retiree's own contribution to the railroad retirement fund, and the return of a taxpayer's own contribution is certainly not "income." 26 U.S.C. §§ 61(a), 62(a)(6). Under the Code, Tier II benefits are taxed as annuities;[13] and annuities are taxed only to the extent they represent income. *Id.* § 72(b). Because a recipient's own investment in an annuity may not be taxed, he may exclude from income the portion of benefit payments that represents his previous contribution to the annuity fund.

Section 72 of the Code explains how to calculate the portion of Tier II benefits excludable from income as return of the taxpayer's contribution. *Id.* § 72(b), (c), (r). If Wallers and Fortier did not exclude from income benefits representing their own contributions, they may be entitled to partial refunds.[14] We cannot determine this matter definitively here, however, since we have not been provided with sufficient information and because Wallers and Fortier did not assert this claim with the IRS as a basis for a refund. *First Nat'l Bank of Fayetteville v. United States*, 727 F.2d 741, 744 (8th Cir.1984) (a court may not consider any grounds for a refund, even if valid, that were not first specifically presented to the IRS); *Ottawa Silica Co.*

---

**12.** An example may be helpful. Suppose that a railroad retiree and a non-railroad retiree who earned equal amounts of money when they were working now are entitled to benefits from their respective programs. The railroad retiree receives $10,000 in Tier I benefits and $5,000 in Tier II benefits. The non-railroad retiree receives $10,000 in social security (because Tier I income necessarily equals social security income). Before the Solvency Act, the railroad retiree would have been better off than the non-railroad retiree by $5,000. After the Act, the railroad retiree is better off by $5,000 minus what he must pay in income taxes on that $5,000.

**13.** Pursuant to 26 U.S.C. § 72(r)(1), Tier II benefits are treated as private pensions under 26 U.S.C. § 401(a). Section 401(a) pensions are treated as annuities under 26 U.S.C. § 402(a).

**14.** Before 1974, payroll taxes were not designated as Tier I and Tier II. Section 72 explains in detail how Wallers and Fortier should calculate what the Code deems to be their contributions to the Tier II program during the years they worked. *Id.* § 72(r)(2)(B)(iii). Subject to the statute of limitations, Wallers and Fortier may file with the IRS a new claim for refund.

*v. United States*, 699 F.2d 1124, 1138 (Fed. Cir.1983).

## IV.

For the reasons stated above, the decision of the district court is

AFFIRMED.