SHAE D. GARTNER, APPELLEE, V.
JENA R. HUME, APPELLANT.

686 N.W.2d 58

Filed August 24, 2004. No. A-03-620.

Philip M. Kelly, of Douglas, Kelly, Ostdiek, Bartels & Neilan, P.C., for appellant.

Kimberly J. Quandt, of Sonntag, Goodwin & Quandt, P.C., for appellee.

CARLSON, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## I. INTRODUCTION

In this proceeding to modify a paternity judgment, Jena R. Hume appeals from the district court's order denying permission to remove the child to Colorado and granting an increase in child support. Because we conclude that the trial court did not abuse its discretion except in determining the mandatory retirement deduction and in granting only a prospective increase in child support, we affirm as modified.

## II. BACKGROUND

### 1. INITIAL ACTION

On October 7, 1999, Shae D. Gartner filed this paternity action against Jena, asserting that Shae was the father of Triston G. Gartner-Hume, who was born on September 30, 1999. Shae also filed a motion for paternity testing. Court-ordered paternity testing confirmed Shae to be Triston's father. On July 3, 2000, the parties filed a stipulation regarding child custody, visitation, and child support.

On July 25, 2000, the trial court entered an order pursuant to the parties' stipulation. The court awarded joint legal custody of Triston to both parties and primary physical custody to Jena, subject to Shae's reasonable visitation rights including, but not limited to, every other weekend, a 4-hour weeknight visitation once each week, alternating holidays, Triston's birthday, and summertime visitation. The court granted both parties the "right of first refusal to have [Triston] in his or her care when the other

party requires a day care provider." The court ordered Shae to pay $350 per month in child support and to maintain health insurance for Triston. Each party was ordered to pay half of Triston's uncovered medical expenses, and the parties were ordered to take turns claiming Triston as a dependent for income tax purposes.

## 2. Previous Modification Proceeding

On June 14, 2001, Shae filed an application for modification of physical custody. On February 26, 2002, Jena filed her amended response to Shae's motion, together with a counterclaim for modification. Jena alleged that because of her employment with the Colorado Department of Corrections, the State of Colorado had offered her an opportunity to pursue her degree as a registered nurse; that Jena would have to move to Colorado to continue that employment; that she was engaged to a man also employed by the Colorado Department of Corrections and planned to live in Colorado upon her marriage; that it was in Triston's best interests to move to Colorado with Jena; and that upon Jena's move to Colorado, Shae would have reasonable visitation with Triston. Jena prayed for permission to relocate with Triston to Colorado. The court conducted a hearing on June 19.

On August 21, 2002, the trial court entered an order denying Shae's motion to modify custody, granting Jena's request to move Triston to Fort Lyon, Colorado, and providing for visitation by Shae. The order further provided:

> In the event that [Jena] does not complete her intended marriage to her co-worker by October 1, 2002, she is required to move [Triston] back to Sidney, Nebraska.
>
> [Jena] is ordered to maintain employment with the Department of Corrections in Ft. Lyons [sic] upon her move from Nebraska. Failure to do so will result in [Triston's] being returned to Sidney, Nebraska.
>
> [Jena] is ordered to pursue her R.N. degree in accordance with her testimony.

We note that insofar as the trial court's August 21, 2002, order purported to require that Triston be returned to Nebraska if Jena did not comply with certain requirements regarding her education, employment, and marital status, that order constituted a void conditional order. If a judgment looks to the future in an attempt

to judge the unknown, it is a conditional judgment. A conditional judgment is wholly void because it does not "perform in praesenti" and leaves to speculation and conjecture what its final effect may be. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). However, Jena never attempted to utilize the order and did not remove Triston to Colorado under its provisions.

### 3. CURRENT PROCEEDING

On September 11, 2002, Jena filed a motion to modify child support and to modify the court's order concerning the relocation of Triston. Jena alleged that a material change in circumstances had occurred since the July 25, 2000, order in that the incomes of both parties had changed significantly, and she prayed that the court modify the child support pursuant to the Nebraska Child Support Guidelines (Guidelines) to reflect the parties' incomes. Jena also requested that Shae be ordered to pay for both daycare and medical expenses pursuant to the Guidelines. Jena further alleged that after the trial on her previous request to relocate Triston, she was advised the nursing program had been canceled by the school in Fort Lyon; that she had not moved to Colorado as planned; and that she had postponed her marriage because she had not moved to Fort Lyon. Jena requested leave to move to Sterling, Colorado, where she worked for the Colorado Department of Corrections. Jena alleged that she would be able to pursue her nursing degree at a school in Fort Morgan, Colorado. She requested that the court modify its August 21, 2002, order to allow her to move to Colorado without specifying the town in which she would live and to remove the requirements regarding her employment with the Colorado Department of Corrections. Jena also prayed for an order requiring the parties to share responsibility for transporting Triston between Nebraska and Colorado for visitation.

In Shae's answer, he alleged that Jena's motion was frivolous and that based on the unclean hands doctrine, Jena should be estopped from requesting relief. Shae requested an order requiring that Triston remain in Nebraska.

On April 29, 2003, the court conducted a trial on Jena's motion to remove Triston to Sterling and on her motion for modification of child support.

 

### (a) Jena's Testimony

Jena testified at length. Jena was 27 years old at the time of trial. She had been a licensed practical nurse (LPN) for 6 years and lived in Sidney, Nebraska. At the time of the original order, she worked as an LPN at Beverly Healthcare in Sidney, which work required daycare for Triston. At the time of trial, she worked for the Colorado Department of Corrections in Sterling and wanted to return to school to become a registered nurse (RN). Jena never implemented the move to Fort Lyon because the community college she had planned to enroll at temporarily canceled its nursing program. The college informed Jena of the cancellation during the latter part of July 2002 (prior to the trial court's August 21 order). Jena refrained from marrying her fiance because she could not move to Colorado after the nursing program had been canceled and because she did not want to live apart from him after getting married. Jena never obtained employment in Fort Lyon by the Colorado Department of Corrections.

Jena requested specific permission to move to Sterling, rather than generally to the State of Colorado. She claimed that she intended to continue her employment with the Colorado Department of Corrections. She expressed the intention to remain in Sidney with Triston, if the court would not approve her request to move to Sterling. Sterling is approximately 40 miles from Sidney. Commuting from her home in Sidney to her work in Sterling required approximately 45 minutes.

Jena's fiance lives and works in Fort Lyon. The Colorado Department of Corrections, where Jena's fiance works, had placed all transfers on hold for "a couple of months" due to budget constraints. If Jena's fiance were not transferred to Sterling, Jena probably would not marry him; at least at the time of trial, she disclaimed any firm plans to marry.

At the time of trial, Jena, Triston, and Jena's daughter from a previous relationship were living with Gwen Hume, Jena's mother, and with Gwen's boyfriend. Jena had moved three times since Triston's birth.

Jena asserted that she and Shae had always worked well together to accomplish visitation and to accommodate their respective schedules. She intended for that cooperation to continue

if she was allowed to move to Sterling with Triston. With that in mind, Jena offered that on Wednesday evenings, she would bring Triston to Sidney to visit Shae, and that for weekend visits, she would take Triston to Sidney, arrange for Shae to pick Triston up in Sterling, or meet Shae halfway between Sterling and Sidney. She claimed that Triston is accustomed to traveling between Sidney and Sterling on a daily basis. For that reason, she asserted that transporting him for visitation would not be a problem.

All of Jena's family members, except her sister, lived in Sidney, and all of Shae's family members lived there. Jena maintained that if she were to move, Shae and his family would have as much time with Triston as before. Jena acknowledged that Shae and Triston have a close relationship. She agreed that Triston had bonded with his relatives in Sidney and that those relatives all have maintained active roles in Triston's life.

Jena had signed a contract to purchase a house in Sterling, subject to obtaining permission to move. The house has two stories, a finished basement, four bedrooms, and 1½ bathrooms. There is a large play area in the backyard, and a park is located two blocks away. Jena had been preapproved for a loan at a 6- or 8-percent interest rate to purchase the house. The purchase price of the house was to be $155,000, and Jena's monthly payments were to be $1,189.

While Jena was at work, Natasha Wilcox provided daycare for Triston in Sterling and would continue to do so in the event that Jena moved to Sterling. Wilcox had provided daycare since September 2002, and Jena opined that Wilcox is an "excellent" daycare provider. Wilcox is licensed to provide daycare by the Colorado Department of Social Services.

If Jena moved to Sterling, she would live approximately 5 miles from Wilcox and 1 or 2 miles from work. Moving to Sterling would reduce the time she and Triston spent traveling each day from 90 minutes to 10 or 20 minutes. Jena claimed to feel more comfortable having Triston at daycare in the city in which she worked rather than leaving him in daycare in Sidney.

Jena named two Sidney daycare providers that she had contacted "before school started" who did not have any openings. If Triston attended daycare in Sidney, Shae could take him to daycare in the morning after Jena left for work and could easily pick

up Triston from daycare after work and care for him until Jena's 12-hour workday ended.

If Jena relocated to Sterling, Jena's daughter and Triston would attend an elementary school located approximately five blocks from the house Jena intended to purchase. The school operates a preschool program in which Triston could participate, and Jena stated that she had taken both children to the school to meet the principal and teachers. Jena opined that the school is "excellent" and related that the children of some of her acquaintances and colleagues attend that school.

Jena claimed that Sterling offers more activities for children than does Sidney and that she had contacted people in Sterling regarding T-ball, karate, gymnastics, and swimming. Sterling also has a community center. Jena considered Sterling to be a safe place to rear children.

Jena claimed that facilities exist in Sterling to accommodate Triston's asthma condition and that the Sterling hospital is larger than the Sidney hospital. She related that she is familiar with the doctors in Sterling and that Triston could obtain the same level of medical care in Sterling as he receives in Sidney.

Jena's 2000 tax return reflected that Jena's adjusted gross income, including wages from Beverly Healthcare and profits from her nursing care business, was $15,452. Jena's 2000 tax return also shows that Triston attended daycare in Sidney. According to Jena's 2001 tax return, Triston attended the same daycare in Sidney and Jena's adjusted gross income from working for the Colorado Department of Corrections and from her nursing care business totaled $30,545. Jena earned $39,342 in 2002, which reflected shift differential and overtime income. Her employment also provides retirement and health insurance benefits for herself and dental insurance for her children.

Jena generally worked the day shift from 7 a.m. to 3 p.m. She stated that if she moved to Sterling, she would work two 12-hour shifts each week, 6 a.m. to 6 p.m., and two 8-hour shifts, 6 a.m. to 2 p.m., receiving $16.25 per hour. She would ask her employer not to schedule her for evening hours, and she would probably work 24 hours during the week and work on the weekends when Triston was visiting Shae. If she were to move, Jena probably would not work overtime because of nursing school. The

Colorado Department of Corrections would provide a flexible schedule to accommodate her schooling. Her employer notifies Jena on a monthly basis of the hours she will work for the entire month. She does not know which days she will be working from month to month.

Jena had contacted Morgan Community College in Fort Morgan about a nursing program there. Sterling is approximately 30 minutes from Fort Morgan. Jena stated that Morgan Community College offers a part-time nursing program, consisting of half days from 9 a.m. to 1 p.m. on Mondays, Wednesdays, and Fridays, but that the schedule is subject to change each year. If she attended the part-time program at Morgan Community College, she would begin in September 2003 and obtain her degree in approximately 2 years. Jena claimed to have fulfilled all the requirements for admission to the nursing program except for obtaining "Colorado IV certification." Jena testified that she had not applied to Morgan Community College because her employer would not pay her tuition until she became a Colorado resident. Jena testified that she had heard that Morgan Community College might offer a satellite nursing program in Sterling in the future.

Jena claimed that if she became a Colorado resident, her employer would pay for her tuition, fees, and books, as long as she maintained a "B" average. Based on her past schooling, she expected no difficulty in maintaining the required average. Her employer would schedule her work to accommodate her classes. The need for RN's at the Colorado Department of Corrections in Sterling is very high, because there are unfilled RN positions. Once Jena has her nursing degree, she could be employed by the Colorado Department of Corrections as an RN and earn $4,600 per month, rather than the approximately $2,816 she earns each month as an LPN. There are other RN positions available at the Sterling hospital, and she did not want to be limited by the court to working at the Colorado Department of Corrections.

Sidney does not have a nursing program, and the closest Nebraska program is in Scottsbluff, about 75 miles from Sidney. If Jena attended the nursing program in Scottsbluff, she would have to quit her job with the Colorado Department of Corrections; would have to pay for her own books, tuition, and fees; and would be without health insurance and other benefits.

Jena believed that being an RN would benefit her children because she would have a larger income to pay for "material things, fun things, . . . programs for them to join, [and] vacations."

### (b) Gwen's Testimony

Gwen, Jena's mother, testified that Jena was living with Gwen temporarily while Jena recovered from injuries sustained in a car accident. At the time of trial, Gwen had been an RN for 3 years and was working as such for the Colorado Department of Corrections in Sterling, earning $25.50 per hour. Gwen claimed that she is familiar with the department's policies and procedures regarding employee educational benefits. She asserted that the Colorado Department of Corrections would pay for the further nursing education of interested LPN's on staff because there is a shortage of RN's. Gwen was formerly employed as an RN at the hospital in Sidney, making $16.75 per hour, and 6 weeks prior to trial, she had been approached about returning to the Sidney hospital to work for $18.35 per hour. She stated that LPN's at the Sidney hospital earned between $14 and $16 per hour, depending on their experience.

### (c) Shae's Testimony

Shae also testified at length. He claimed to have a "[g]reat" relationship with Triston and stated that Triston was "a lot of fun." When Triston visited Shae, Triston would also see Shae's parents, grandmother, and other relatives who live nearby. Shae stated that either his parents or relatives would come to his home or he would take Triston to see them and that Triston sees them all as much as possible. Triston also sees relatives around town and talks about his cousins. Of Shae's family, Triston most frequently sees Shae's parents. Triston had a growing relationship with Shae's live-in girl friend. Shae stated that his girl friend is a loving adult figure who loves and cares for Triston. Shae and his girl friend had talked about marrying in the future but wanted to defray some financial debts first. Shae and his girl friend live in a quiet neighborhood in a three-bedroom house located approximately one block from his parents' house and 2½ blocks from Gwen's house.

Shae disputed Jena's claim that Sterling has more benefits for Triston than does Sidney. Shae claimed that in comparison to

Sterling, Sidney lacks only an indoor swimming pool. Sidney has activities for children, programs at the community center, and good schooling. Sidney has preschools, and when Triston starts school, Shae wants to be able to attend Triston's school activities.

Shae asserted that he and Jena got along with one another in general and with regard to visitation issues. For a time, Shae worked 4 days each week in Las Vegas, Nevada, returning to Sidney each Friday morning and leaving on Sunday to return to work. Jena and Shae adjusted the visitation schedule to accommodate Shae's work schedule. Shae admitted that Jena had always been committed to working out a visitation schedule, and Shae hoped that she would do the same if she moved to Sterling.

The original order required that Shae have visitation one weeknight each week and every other weekend. Shae testified that since the original order, Jena provided more visitation than the order required. Shae maintained that it was important to have Triston in his care as much as possible and to have the option to care for Triston anytime Jena was working.

If Jena and Triston moved to Sterling, Shae maintained that while the visitation schedule would not change, he anticipated visitation problems due to bad weather, vehicle breakdowns, and "just running late." If Shae missed a visit with Triston due to bad weather or some other cause, Shae would expect Jena to accommodate him in making up the missed visit. If Jena moved, Shae would not be able to watch Triston on short notice as he had in the past. Although Shae thought it was "great" that Jena wanted to continue her education, he did not want to lose time with Triston. Jena was not certain what her schedule would be, and Shae claimed that it could conflict with visitation.

Shae had contacted a daycare provider in Sidney who had agreed to watch Triston. If Jena took Triston to a daycare provider in Sidney, Shae could pick up Triston and would enjoy doing so. Shae also has family members in Sidney who could watch Triston on occasion, including Shae's parents and grandmother.

Shae objected to Jena's moving Triston out of Nebraska because he did not believe it was in Triston's best interests. He stated that Triston has family, friends, and relatives in Sidney and that Triston had been in Sidney his entire life. Shae believed that considering the changes in Triston's residences and daycare

providers, Shae's house was the closest thing that Triston had resembling a stable home. Shae opined that if Triston did move to Colorado, moving to Sterling would be better for Triston than moving to Fort Lyon.

Shae is employed by the Union Pacific Railroad. According to Shae's tax returns, he earned $37,926 in 2000, $44,474 in 2001, and $42,189 in 2002. Shae testified that he earned overtime pay in 2000, 2001, and 2002 and that such overtime pay is reflected in his gross income. Shae expected to earn less income in 2003 than he did in 2002 because he would not work "on the road" as he did in 2002 and would not earn as much overtime pay. Shae's March 15, 2003, pay stub reflected a little less income than what he would be earning if he worked in Sidney rather than out of town.

As an employee of the railroad, Shae had deductions from his income for tier I and tier II railroad retirement benefits, but he did not have traditional Medicare and FICA deductions. He stated that he put 6 percent of his income toward his 401K plan. His employer deducts $48.25 per month from his paycheck for union dues. We summarize Shae's income in more detail in the analysis portion of this opinion.

Shae did not plan to continue taking out-of-town jobs because staying in Sidney would allow him to be at home in the evenings and on weekends and to therefore spend more time with Triston. Although Shae would be making less money by working in Sidney, he expressed a willingness to sacrifice the extra income in order to "make the best possible situation for Trist[o]n."

At the time of trial, Shae was paying Jena $350 per month for child support and was not paying for daycare expenses. Shae included Triston on Shae's medical and prescription plan and tried to split with Jena those expenses not covered by insurance. Because Shae no longer travels in his job, he claimed that it would be difficult for him to reimburse Jena for daycare expenses.

### (d) Judicial Notice of Prior Hearing

At the close of evidence and at the request of both parties' attorneys, the trial court took judicial notice of a June 2002 hearing in this case, which appears in the record in the form of a supplemental bill of exceptions. To the extent that the testimony from that hearing has any bearing upon our review, we will address such testimony in the analysis section of this opinion.

### 4. Trial Court's Order

On May 5, 2003, the trial court entered an order increasing Shae's child support obligation to $489 per month commencing April 1, 2003. The order denied Jena's request to modify the payment of uncovered medical costs. Regarding Jena's motion to remove Triston from Nebraska, the trial court stated:

> The threshold question is whether there is a material change of circumstances that has occurred since the last hearing. Truly, other than [Jena's] changing her mind, nothing has changed. She is working at the same place, living at the same place and doing the same things. There is no material change of circumstances since the last hearing. As there is no material change of circumstances, this Court has no authority to modify the order of the Court. As the Court is without authority to modify[,] the Motion to Allow the Removal of [Triston] from the State of Nebraska is dismissed.

### III. ASSIGNMENTS OF ERROR

On appeal, Jena alleges that the district court abused its discretion (1) in denying Jena's motion to remove Triston from Nebraska, (2) in not applying the modification of child support retroactively to the first day of the month following the filing date of the application for modification, (3) in calculating child support by deducting Shae's 401K contributions, (4) in determining the parties' monthly income, and (5) in denying Jena's request that Shae pay a share of daycare expenses.

### IV. STANDARD OF REVIEW

■ Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial judge, and although reviewed de novo on the record, the trial judge's determination will normally be affirmed absent an abuse of discretion. *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

■ Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is

reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

Interpretation of the Guidelines presents a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002).

## V. ANALYSIS

### 1. Removal of Triston From Nebraska

Jena argues that the trial court incorrectly applied the "material change in circumstances test" to determine whether she could remove Triston from Nebraska. Brief for appellant at 14. We agree that the existence of a material change does not directly apply to an application for removal. However, the best interests of the child dictate the court's determination regarding either a modification of child custody or a proposed removal of children from the state. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000).

In this instance, we believe the trial court used "material change of circumstances" as a shorthand phrase to address the application of one of the doctrines concerning finality of prior adjudications, such as res judicata, collateral estoppel, or law of the case. The circumstances of Jena's successive motions requesting leave to remove Triston to Colorado might have supported consideration of one or more of these principles. However, Shae did not raise them as affirmative defenses in his answer. See, e.g., *DeCosta Sporting Goods, Inc. v. Kirkland*, 210 Neb. 815, 316 N.W.2d 772 (1982) (res judicata is affirmative defense which must ordinarily be pleaded to be available). An appellate court may raise the issue of res judicata sua sponte, but infrequently elects to do so. See *Dakota Title v. World-Wide Steel Sys.*, 238 Neb. 519, 471 N.W.2d 430 (1991). Without determining whether the trial court erred in considering the matter not raised by the pleadings, on our de novo review, we address the merits of Jena's request for removal of Triston from Nebraska under the factors set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

■ To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.*

## (a) Legitimate Reason to Leave State

A reasonable expectation of improvement in the career or occupation of the custodial parent is a legitimate reason to relocate. See *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987). The Nebraska Supreme Court has also recognized the pursuit of educational opportunities as a legitimate reason to move to another state. See *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). Jena testified that moving to Colorado would allow her to obtain her nursing degree at the expense of her employer and in turn significantly increase her income and improve the quality of life for herself and her children. She testified that she would not be able to obtain her nursing degree while living in Sidney without quitting her job in Sterling and incurring significant expenses. On our de novo review, we determine that Jena established a legitimate reason to move to Colorado.

## (b) Triston's Best Interests

The Nebraska Supreme Court has set forth three factors to be considered in determining whether removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. See *Farnsworth v. Farnsworth, supra.*

### (i) Each Parent's Motives

Jena and Shae each have valid reasons for taking their respective positions on Triston's removal from Nebraska. Jena seeks to further her education and better her career, which we have determined is a legitimate motive. No evidence suggests that Shae resists removal in bad faith or for manipulative purposes. Shae's

testimony demonstrates that he is primarily concerned with maintaining frequent and regular contact with Triston. This also constitutes a valid motive. Thus, it appears that the motives of each party are equally balanced.

### (ii) Quality of Life

The factors to consider in determining the effect removal to another jurisdiction would have on the quality of life of the parent seeking removal and of the child include (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.* We consider only those factors relevant to the case at hand, in light of the evidence before us.

### a. Enhancement of Income or Employment

Jena testified that once she obtained her nursing degree, she would be eligible for an RN position with her employer and for a raise in pay from the approximately $2,816 per month she earns as an LPN to approximately $4,600 per month. On our de novo review, we conclude that Jena established at least a reasonable probability that enhanced income and employment would be realized by moving to Colorado.

### b. Improvement of Housing or Living Conditions

At the time of trial, Jena, Triston, and Jena's daughter were residing with Gwen and Gwen's boyfriend. Jena adduced no evidence regarding the characteristics or quality of that residence.

Jena testified that she had signed a contract to buy a four-bedroom house in Sterling, subject to receiving permission to move to Colorado. The house has a large play area in the backyard and is near a park and a school. Jena described the house in Sterling as a favorable environment for her children. Although we have no specific evidence to compare Jena's present residence with the Sterling house, at least an inference suggesting improvement arises, because most adults would prefer an independent housing arrangement rather than residing with their parents.

We also note that the purchase price of the house in Colorado is $155,000. Jena had obtained financing at an interest rate of 6 or 8 percent, and her monthly payments were to be $1,189. Jena testified that the nursing program in which she planned to enroll would take approximately 2 years to complete and that without a nursing degree, she earns approximately $2,816 per month. We cannot determine whether this obligation would strain Jena's finances or, if so, whether any financial difficulties would adversely affect Triston. On de novo review, we find little evidence that housing or living conditions would be significantly improved by moving to Sterling.

### c. Educational Advantages

Jena testified that Sterling has more activities for children than does Sidney, but Shae testified that compared to Sterling, Sidney lacks only an indoor swimming pool. Jena testified that the school she had chosen in Sterling is excellent, and Shae testified that Sidney has "good schooling." However, the parties provided mere opinion testimony, with no objective evidence to compare the respective educational environments. Shae testified that if Triston attended school in Sterling, Shae would not be able to attend Triston's school activities. We conclude that Jena did not prove that Triston would gain any significant educational advantage by moving to Sterling.

### d. Physical Needs

Jena testified that facilities exist in Sterling to accommodate Triston's asthma condition; however, she also testified that Triston would receive the same level of care that he currently receives in Sidney. Thus, with regard to Triston's physical needs, Jena did not establish that Sterling has any advantage over Sidney.

## e. Quality of Relationship Between
## Triston and Parents

The effect of the removal to another jurisdiction must be evaluated in light of the child's relationship with each parent. See, *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002) (considering which parent had primary relationship with child); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000) (concluding that close relationship and extensive contacts between father and children weighed against long-distance relocation with mother).

There was no specific testimony about Jena's relationship with Triston. However, the evidence does show that Jena is Triston's primary caretaker and that she was making arrangements for Triston's schooling and daycare with Triston's best interests in mind. Jena testified that after her initial motion for removal of Triston to another state, she had chosen to stay in Nebraska and maintain custody of Triston rather than move to Colorado and get married. She also testified that she would choose to stay in Nebraska with Triston if her second motion for removal was denied.

Shae testified that he had a good relationship with Triston, and Jena acknowledged that Shae had a close relationship with Triston. Shae stated that he strove to regularly and consistently exercise visitation, compensating for visits he missed while working out of town. Shae stated that he is concerned that a move to Colorado would reduce the time he spends with Triston. Shae expressed an interest in attending school activities when Triston started school.

This evidence establishes that both parents have a good relationship with Triston.

## f. Ties to Sidney and Extended Family

Triston has extended family in Sidney on both parents' sides. At the time of trial, he and Jena were living with Gwen, Jena's mother, just a few blocks from Shae's house and Shae's parents' house. Shae testified that Triston would see his paternal grandparents and other relatives while visiting Shae and that Triston spoke of his cousins and encountered relatives around town. Jena testified that Triston had bonded with his relatives in Sidney and

that they all had active roles in his life. Shae testified that because Jena has changed residences several times, he feels his house in Sydney is the only real home that Triston knows. The evidence shows that Triston has numerous ties to Sidney and to his extended family in that community.

The original judgment provided each parent with a "right of first refusal" to provide childcare when the other parent required a daycare provider. The testimony during the June 2002 hearing provides persuasive evidence that Shae extensively exercised that right. Although the parties disputed the exact number of occasions, Shae clearly used these opportunities to maintain extensive contact with Triston above and beyond a normal visitation schedule.

### (iii) Effect of Removal on Contact Between Triston and Shae

This factor focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship, and courts typically view this factor in light of the potential to establish and maintain a reasonable visitation schedule. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* In determining reasonableness, our considerations include the frequency and the total number of days of visitation, the distance traveled and expense incurred, and the custodial parent's willingness to comply with a modified visitation schedule. See *id.*

Jena and Shae agree that they have always worked well together to accomplish visitation and to accommodate their respective schedules. Jena expressed her intent to maintain the visitation schedule already in place even if she and Triston moved to Sterling by taking Triston to Sidney, by allowing Shae to pick Triston up in Sterling, or by meeting Shae halfway between the two communities. Shae testified that he believed the distance between Sterling and Sidney would reduce his time with Triston due to inclement weather, vehicle breakdowns, and lost opportunities to visit Triston on short notice or to watch him when daycare was unavailable. Jena testified that Triston is

accustomed to traveling between Sidney and Sterling daily and that transporting him for visitation therefore would not be a problem. However, the evidence persuades us that the move to Sterling would effectively nullify, for Shae, the "right of first refusal" for childcare. Because Shae has utilized that provision to exercise visitation far beyond a standard visitation schedule, implementing a standard visitation arrangement after the proposed move would significantly diminish Shae's opportunity for visitation.

While Jena has demonstrated her willingness to work with Shae in scheduling visitation, we conclude that moving Triston to Sterling would significantly diminish Shae's ability to maintain the relationship that the parties agreed to foster with the "right of first refusal."

### (iv) Best Interests Conclusion

In light of the strong ties that Triston has to Shae and other extended family in Sidney and the extensive visitation contemplated by the parties through the "right of first refusal," which Shae has utilized, we cannot conclude that the trial court abused its discretion in denying Jena's motion to move Triston to Sterling. While we may not have viewed the evidence initially in precisely the same way as did the trial court, we cannot conclude that the result is untenable or that the decision deprives Jena of a just result.

### 2. CHILD SUPPORT

### (a) Averaging Shae's Monthly Income

Jena assigns that the trial court erred in using $3,190.09 as the figure for Shae's monthly income, rather than $3,518.42, a figure based on Shae's 2002 tax return. Shae receives two paychecks each month. Shae testified that his March 15, 2003, pay stub reflects what his income would be if he worked in Sidney rather than out of town and took fewer overtime hours, which was his plan. According to that pay stub, Shae's adjusted gross income for that pay period was $1,472.35 for 82½ hours of work. Although the trial court did not specify how it arrived at $3,190.09 for Shae's monthly income, that figure can be derived by multiplying $1,472.35 by 26 (paychecks per year) and

dividing by 12 (months in a year). See Guidelines, paragraph D. Thus, the trial court accepted Shae's testimony regarding his income and future overtime as the status of his income at the time of trial. The trial court's monthly income figure of $3,190.09 is supported by the evidence, and we conclude that the court did not abuse its discretion in using that figure.

### (b) Retirement Deductions

Jena assigns that the trial court used an incorrect figure in calculating Shae's mandatory retirement plan contribution. According to the trial court's child support worksheet, the trial court deducted $557.31 from Shae's monthly salary for his mandatory retirement plan contribution. Although the trial court did not explain how it calculated this number and we have been unable to replicate this exact figure with our calculations, it is apparent that the trial court deducted tier I and tier II railroad retirement contributions, union dues, and 401K contributions from Shae's monthly income, lumping all of these items under the deduction for "Mandatory Retirement."

Paragraph E(4) of the Guidelines provides for the deduction of "[i]ndividual contributions, in a minimum amount required by a mandatory retirement plan." Paragraph E(4) further provides: "Where no mandatory retirement plan exists, a deduction shall be allowed for a continuation of actual voluntary retirement contributions not to exceed 4 percent of the gross income from employment . . . ." Jena argues that Shae's tier II railroad retirement contributions are part of a mandatory retirement plan and that the trial court therefore erred in also allowing a deduction for Shae's 401K contributions because those contributions were voluntary. Shae conceded in his brief that the 401K contributions are voluntary. However, Shae maintains that the tier II amount represents a tax rather than a mandatory retirement contribution and that the 401K contributions thus are properly deductible.

■ In *Wallers v. U.S.*, 847 F.2d 1279, 1280-81 (7th Cir. 1988), the U.S. Court of Appeals explained the history of the tier I and tier II railroad retirement programs as follows:

> In 1937, Congress bifurcated the federal old age insurance program between the social security system and the railroad retirement system. . . . Until 1974 railroad retirement benefits were funded through payroll taxes paid in equal

amounts by employers and employees. The applicable payroll tax rate was consistently higher than the social security payroll tax rate. . . .

In 1974, the railroad retirement system was divided into two programs. The Tier I program became the equivalent of social security. It taxes railroad employers and employees at the social security tax rate and distributes retirement benefits equal to those distributed by social security. Railroad retirees receive additional benefits under the Tier II program, which, from 1974 to 1981, was financed by payroll taxes paid solely by employers. *Since 1981, railroad employees have been required to pay a small percentage of their income to the Tier II program.*

All railroad retirement and social security benefits were tax exempt until Congress passed the Railroad Retirement Solvency Act of 1983 (the "Act" or the "Solvency Act"), Pub.L. No. 98-76, 97 Stat. 411 (codified in scattered sections of 26 U.S.C., 42 U.S.C. and 45 U.S.C.), in an effort to raise what it determined was much-needed revenue for the railroad retirement program. One feature of the Act is the imposition of an income tax on railroad retirement benefits. Tier I benefits are taxed in the same manner as social security benefits. . . . Tier II benefits, however, are taxed as qualified private pensions. Except to the extent they represent the taxpayers' own contributions, all Tier II benefits are taxed.

(Emphasis supplied.) Thus, as the system is explained in *Wallers v. U.S.*, *supra*, tier I railroad retirement contributions represent a railroad employee's equivalent to Social Security. We conclude that tier I railroad retirement contributions are deductible under paragraph E(2) of the Guidelines. See *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999) (payments of self-employment taxes by self-employed parent are deductible under paragraph E of Guidelines). While tier I railroad retirement contributions should have been deducted on a different line of the worksheet than the line employed by the trial court, that does not affect the bottom line.

■ We further conclude that tier II railroad retirement contributions constitute mandatory retirement contributions and, as

such, are deductible under paragraph E(4) of the Guidelines. See, also, *Montgomery v. Bolton*, 349 Ark. 460, 79 S.W.3d 354 (2002) (because tier II contributions are automatic, involuntary, and nonrefundable, they are deducted from net income in calculating child support in order to accurately reflect railroad employee's disposable income).

Shae argues that the tier II deduction is a tax on railroad employees, as defined by the Internal Revenue Code, and that although such tax is automatically deducted, it does not constitute a mandatory retirement contribution. The Internal Revenue Code, I.R.C. § 3201 (Supp. I 2001), provides for the imposition of the "Tier 2 tax" on railroad employees as follows:

**(1) In general**

In addition to other taxes, there is hereby imposed on the income of each employee a tax equal to the applicable percentage of the compensation received during any calendar year by such employee for services rendered by such employee.

**(2) Applicable percentage**

For purposes of paragraph (1), the term "applicable percentage" means—

. . . 4.90 percent in the case of compensation received during 2002 or 2003[.]

Although the federal statute characterizes the tier II deduction as a "tax," that label does not necessarily dictate the proper classification of tier II deductions under the Guidelines. See *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003) (contributions may be "mandatory" under the Guidelines notwithstanding opposite characterization by federal regulations). Based on the explanation in *Wallers v. U.S.*, 847 F.2d 1279 (7th Cir. 1988), we conclude that in reality, mandatory tier II railroad retirement contributions function under the Guidelines as mandatory retirement contributions.

Shae concedes that unlike tier II railroad retirement contributions, his 401K contributions are not mandatory. Paragraph E(4) of the Guidelines authorizes a deduction for voluntary retirement contributions only "[w]here no mandatory retirement plan exists." Because tier II railroad retirement contributions function as a

"mandatory retirement plan" for railroad employees, it follows that in this case, no deduction may be allowed for voluntary retirement contributions. Therefore, under the requirements of paragraph E(4) of the Guidelines, the trial court erred in deducting Shae's 401K contribution from his income. Neither party assigns error under paragraph E(4) in the deduction of the union dues, and accordingly, we do not consider the propriety of including union dues as part of the mandatory retirement deduction.

Upon excluding the amount of Shae's monthly 401K contribution from the mandatory retirement deduction, we conclude that Shae's mandatory retirement deduction is $458.78. This results in Shae's monthly child support obligation being properly calculated as $506 rather than $489.

### (c) Retroactive Application of Child Support

Jena filed her motion for modification of child support on September 11, 2002. On May 5, 2003, the trial court entered its order requiring an increase in child support from $350 per month to $489 per month commencing April 1, 2003. Jena argues that the trial court abused its discretion in not applying the modification of child support retroactively to the first day of the month following the filing date of the application for modification. She urges that such retroactive application would not be a hardship for Shae and would be in Triston's best interests.

The main principle behind the Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes. *Riggs v. Riggs*, 261 Neb. 344, 622 N.W.2d 861 (2001). The initial determination regarding the retroactive application of the modification order is entrusted to the discretion of the trial court. *Id.* The rule, absent equities to the contrary, should generally be that the modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). The best interests of the child are the paramount concern, and the hardship to the noncustodial parent may also be considered in determining the propriety of retroactive application. See *Moore v. Bauer*, 11 Neb. App. 572, 657 N.W.2d 25 (2003).

We determine that the facts in this case require that the modified support obligation become effective as of October 1, 2002, the first day of the month following the date of the filing of Jena's petition for modification. In a modification of child support proceeding, the child and custodial parent should not be penalized, if it can be avoided, by the delay inherent in our legal system. *Erica J. v. Dewitt*, 265 Neb. 728, 659 N.W.2d 315 (2003). Shae has been steadily employed by the railroad. The trial court did not explain or describe, nor can we find in our de novo review of the record, any equities that would support a decision not to apply the child support obligation retroactively. We find that the trial court abused its discretion in that regard and that the increase in Shae's child support obligation should be retroactive to October 1, 2002.

### 3. CHILDCARE EXPENSES

Jena argues that in not ordering Shae to pay a portion of childcare expenses, the trial court deviated from paragraph N of the Guidelines. That paragraph was amended effective September 1, 2002. For the reader's convenience, we quote paragraph N by striking the language removed by the amendment and underlining the new language as follows:

> Child-care expenses are not specifically computed into the guidelines amount and are to be considered independently of any amount computed by use of these guidelines. Child-care expenses for the child for whom the support is being set, which are due to employment of either parent or to allow the parent to obtain training or education necessary to obtain a job or enhance earning potential, ~~shall be divided between the parents in proportion to their parental contribution~~ shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution . . . and shall be added to the basic support obligation computed under these guidelines.

This provision of the Guidelines applies to support ordered in paternity cases as well as for children born within a marriage relationship. See *Dworak v. Fugit*, 1 Neb. App. 332, 495 N.W.2d 47 (1992).

The stipulation of the parties did not address childcare expenses, nor did the original order. Jena moved for a modification

of that order, requesting an order requiring Shae to pay a portion of childcare expenses. The trial court implicitly denied Jena's motion with regard to childcare expenses. See *Olson v. Palagi*, 266 Neb. 377, 665 N.W.2d 582 (2003) (silence of judgment, disposing of petition to modify, on issue of attorney fees is construed as denial of request for such fees).

A party seeking to modify a child support order must show a material change of circumstances which occurred subsequent to the entry of the original decree or a previous modification which was not contemplated when the prior order was entered. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). The paramount concern and question in determining child support, whether in the initial marital dissolution action or in the proceedings for modification of decree, is the best interests of the child. *Id.* In determining whether to modify an award with respect to childcare expenses, this court has compared the need for work-related childcare at the time of the original decree with the need for such childcare at the time of the modification hearing. See, *Mace v. Mace*, 9 Neb. App. 270, 610 N.W.2d 436 (2000) (original decree did not mention childcare expenses, and trial court did not err in modifying decree to require contribution for childcare expenses by noncustodial parent where custodial parent had held jobs requiring childcare after original decree, did not require childcare at time of modification hearing, but testified that she may secure job necessitating childcare in future); *Robbins v. Robbins*, 3 Neb. App. 953, 536 N.W.2d 77 (1995) (mere fact that before original decree parties do not require childcare but anticipate future changes of employment and potential for childcare expenses to arise is not sufficient for holding that such expenses are reasonably contemplated).

When the original order was entered, Jena worked at Beverly Healthcare in Sidney. At that time, Jena required daycare for Triston and took Triston to a daycare provider in Sidney. Jena testified at the modification hearing that she worked in Sterling and that Triston had received childcare in Sterling since September 2002. The evidence shows that the need for work-related childcare was contemplated at the time of the original hearing, but the parties chose to omit any such relief at that time. Unless the change in the Guidelines, which change we discuss below, would

otherwise affect the analysis, Jena did not show a material change in circumstances with regard to childcare.

We note that the amendment to paragraph N of the Guidelines became effective September 1, 2002, after the trial court entered the original order. Under certain circumstances, an amendment to the Guidelines can itself be considered a material change in circumstances warranting modification of a parent's child support obligation. See, *Schmitt v. Schmitt*, 239 Neb. 632, 477 N.W.2d 563 (1991) (adoption of Guidelines constituted material change of circumstances warranting change in child support obligations, notwithstanding that such material change resulted from change of law rather than from actions of parties; and Guidelines must be used to calculate new support amount); *Phelps v. Phelps*, 239 Neb. 618, 477 N.W.2d 552 (1991); *Sneckenberg v. Sneckenberg*, 9 Neb. App. 609, 616 N.W.2d 68 (2000) (upward revision of Guidelines constitutes material change of circumstances that can warrant upward modification of parent's child support obligation, independent of changes in that parent's income); *Olmer v. Olmer*, 2 Neb. App. 178, 507 N.W.2d 677 (1993) (amendment of Guidelines might be considered material change in circumstances).

Insofar as these parties are concerned, both the former version and the current version of paragraph N of the Guidelines would operate in essentially the same way. The former version mandated allocation of such expenses by the party's percentage share of both parties' net income. The current version authorizes the court to determine the allocation, but limits a party's contribution to that same percentage share. The amendment did not change the rule concerning the circumstances in which such contributions are appropriate; rather, the amendment affected only the allocation of such expenses. Because the original order did not require Shae to contribute anything to childcare expenses, much less an amount in excess of his parental contribution, we conclude that the amendment to paragraph N of the Guidelines did not constitute a material change in circumstances. Jena did not prove a material change in circumstances, and the amendments to the Guidelines did not constitute a material change under these circumstances. We conclude that the trial court did not abuse its discretion in implicitly denying

Jena's request for modification of the order regarding childcare expenses.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the trial court as modified with respect to Shae's child support obligation and the retroactive application of that obligation.

AFFIRMED AS MODIFIED.