IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

MULDER V. MULDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SAMANTHA A. MULDER, NOW KNOWN AS SAMANTHA A. KENNEDY,
APPELLEE AND CROSS-APPELLANT,
V.
GREGORY D. MULDER, APPELLANT AND CROSS-APPELLEE.

Filed April 2, 2013.    No. A-12-355.

Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed in part, and in part reversed and remanded with directions.

Amy Sherman, of Sherman & Gilner, P.C., L.L.O., for appellant.

John A. Kinney and Jill M. Mason, of Kinney Law, P.C., L.L.O., for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Gregory D. Mulder appeals from an order of the district court for Douglas County, which denied his application to modify custody and granted the countercomplaint of Samantha A. Mulder, now known as Samantha A. Kennedy, for permission to remove the parties' child from Nebraska to Iowa. Samantha cross-appeals, challenging the court's use of a joint custody worksheet to recalculate child support. We affirm the court's ruling concerning the motion for removal and the ruling concerning Gregory's request to modify custody. We reverse the court's determination of child support and remand the matter of child support to the district court.

## II. BACKGROUND

The parties were married in February 2005. The minor child of the parties, John Christian Morrissey-Mulder, was born in December of that year, after the parties had separated and after Samantha had filed a complaint for dissolution of marriage. On May 24, 2007, the trial court

entered a decree of dissolution approving the property settlement of the parties and the stipulated parenting plan. Under the parenting plan, the parties agreed to joint legal custody of John and to Samantha's having primary physical custody, subject to Gregory's right to reasonable and liberal visitation. Gregory's parenting time consisted of every other weekend from Friday at 5 p.m. through Sunday at 5 p.m.; Tuesday overnights from 5 p.m. to Wednesday at 8:30 a.m.; and Thursday overnights from 5 p.m. to Friday at 8:30 a.m., when there is not weekend visitation. Gregory was also allowed 10 days of summer visitation, as well as alternating holidays. Gregory was ordered to pay $850 per month in child support.

On June 4, 2010, Gregory filed an application to modify, asking the court to award him joint physical custody of John and to modify child support. Samantha subsequently filed an answer and a countercomplaint to modify. She alleged that a material change in circumstances had occurred since the entry of the decree in that she was engaged to be married on December 31 and that her fiance lived and worked in the Des Moines, Iowa, area. She sought permission to move with John to Iowa, as well as a modification of parenting time and a modification of child support.

Trial was held in July 2011. The evidence showed that Samantha met her current husband, Sean Kennedy, in July 2009. Sean was living in St. Charles, Iowa, near Des Moines, and was employed in a longstanding career as an executive vice president of a company in West Des Moines, Iowa. Sean had lived in St. Charles for 17 years and has three children from a previous marriage, and he and his ex-wife share joint custody of their children. After Gregory filed his application to modify, but before Samantha filed her answer and countercomplaint, Samantha and Sean got engaged. They were married on December 31, 2010, as Samantha had alleged in her answer and countercomplaint. In January 2011, Samantha gave up her full-time job as an elementary school teacher in favor of a more flexible schedule as a substitute teacher. Samantha also sold her home during the pendency of this action, and she and Sean purchased a new home in St. Charles. Samantha and John were living with her parents in Omaha, Nebraska, while this case was pending.

The evidence also showed that before Gregory filed his application to modify the decree in June 2010, the parties were able to cooperate and work well together for the most part in coparenting John. Gregory testified that Samantha had agreed to parenting time in addition to that set forth in the parenting plan and that they had made decisions involving John jointly. However, after Gregory filed his application to modify, the parties experienced difficulty getting along with each other and communicating with each other. For instance, Gregory testified that on many occasions Samantha did not tell him where to pick up John for his parenting time and had to drive to multiple places to find him.

Additional evidence will be discussed as necessary in the analysis section below. The trial court entered an order on April 23, 2012, granting Samantha's countercomplaint for removal, finding that she had a legitimate reason to leave the state and that removal was in John's best interests. The court denied Gregory's application to modify custody. Further, the court modified Gregory's child support obligation from $850 per month to $470.48 per month based on a joint custody calculation.

## III. ASSIGNMENTS OF ERROR

Gregory assigns, restated, that the trial court erred in (1) allowing Samantha to remove John from the jurisdiction and (2) failing to award him joint physical custody of John.

On cross-appeal, Samantha assigns that the trial court erred in using a joint custody child support calculation, thereby reducing Gregory's child support obligation.

## IV. STANDARD OF REVIEW

Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Gartner v. Hume*, 12 Neb. App. 741, 686 N.W.2d 58 (2004).

## V. ANALYSIS

### 1. REMOVAL OF JOHN FROM NEBRASKA

Gregory first assigns that the trial court erred in granting Samantha's request to permanently remove John from Nebraska. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Colling v. Colling, supra.* After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.*

### (a) Legitimate Reason to Leave State

The threshold question in removal cases is whether the parent wishing to remove the child from the state has a legitimate reason for leaving. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Samantha's reason for wanting to remove John from Nebraska to Iowa at the time her countercomplaint was filed was because her fiance, Sean, lived and worked near Des Moines, and they planned to get married on December 31, 2010. At the time of trial, Samantha and Sean were married and Sean was still living and working near Des Moines.

Remarriage is commonly found to be a legitimate reason for a move in removal cases. *Colling v. Colling, supra.* And the Nebraska Supreme Court has determined that a move to reside with a custodial parent's new spouse who is employed and resides in another state may constitute a legitimate reason for removal. *Id.*

We conclude in this case that Samantha's desire to relocate to Iowa in order to live with her new spouse is a legitimate reason to leave Nebraska.

(b) Child's Best Interests

After clearing the threshold of demonstrating a legitimate reason for leaving the state and removing a minor child to another state, a custodial parent must demonstrate that it is in the child's best interests to continue living with him or her. *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009). In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Id*.

*(i) Each Parent's Motives*

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). Samantha sought removal because she was engaged to and subsequently married a resident of Iowa and wished to live with him there. On the other hand, Gregory opposed the move because he wished to continue having frequent parenting time with John. There is no evidence that either party has acted in bad faith. Samantha had a compelling motive to seek the move, and Gregory had an equally compelling motive to resist the move. We conclude, as the trial court did, that the parties' motives are equally balanced and that this factor does not weigh in favor of or against the relocation.

*(ii) Quality of Life*

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the child, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the relocating parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Colling v. Colling, supra.* We will consider each factor in turn.

Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*. And while custody is not to be interpreted as a sentence to immobility, it is important in contemplating a move such as this one to give due consideration to whether such move indeed will improve the children's lives, or merely maintain the status quo, only in a new location. *Id*.

### a. Child's Emotional, Physical, and Developmental Needs

We first consider the impact on the child's emotional, physical, and developmental needs in assessing the extent to which the move could enhance the child's life. The evidence shows that John is bonded to both parents and that both parents meet his emotional, physical, and developmental needs. However, Samantha has been primarily responsible for John's physical and emotional needs from the time he was born due to the fact that the parties were already separated when John was born.

Further, Samantha has been more involved with John's educational development. As a teacher, she was worried about his readiness for kindergarten, so she had been working with him at home to get him ready for school. She also had John evaluated at a school in Omaha to see if he was ready for kindergarten. Samantha also testified that if allowed to move, she planned to be a stay-at-home mother which would allow her to take John to and pick him up from school and to have more time to spend with him.

Samantha has another son from a previous relationship that John has been growing up with and that he spends a lot of time with. Samantha testified that her sons have a very close relationship and are best friends. She also testified that when she talks to John on the telephone when he is at Gregory's house, John will ask to talk to his brother.

The evidence also revealed that Gregory believes John has an eating disorder because he eats a very limited number of foods. There was some evidence to support Gregory's belief. For instance, in December 2010, John's preschool teacher suggested that Samantha take John to a doctor for a physical because she was concerned that his eating habits were affecting his ability to concentrate and learn. Samantha denies that John has an eating disorder or that there is a problem with his diet. At the time of trial, Gregory had been working with John about trying new foods and the variety of foods he ate was expanding.

When all the evidence is considered, however, this factor weighs in favor of removal.

### b. Child's Preference as to Where to Live

Both parties agree that given John's age, he is too young to express a preference as to where he wants to live. This factor is not given any weight.

### c. Enhancement of Income or Employment

Another factor to consider is whether Samantha's income or employment will be enhanced if allowed to relocate. Samantha left her full-time teaching position and has been substitute teaching. She has indicated that if allowed to relocate, she intends to be a stay-at-home mother and not work outside the home. Therefore, Samantha has not established that her income will increase or her employment will be enhanced if allowed to move. However, a custodial parent's income can be enhanced because of a new spouse's career opportunities, for purposes of determining the potential that removal of children to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). The evidence showed that in the last 2 years, Sean earned $165,000 annually plus annual bonuses of $25,000 one year and $55,000 the other year. In 2010, when Samantha was teaching full time, she earned $42,000. Based on Samantha's husband's

career and income, her household income will increase and her standard of living will be improved, and as such, John's standard of living will be enhanced through relocation. Therefore, this factor weighs in favor of removal.

### d. Improvement of Housing
### or Living Conditions

There is evidence that the housing and living conditions for John would improve if Samantha was allowed to move. At the time of trial, Samantha was living with her parents pending a decision by the trial court as to removal. She testified that if she was not allowed to move to Iowa, she would rent an apartment in Omaha. Prior to moving in with her parents, Samantha had a three-bedroom, split-entry house, which she listed for sale at $120,000.

If allowed to move to Iowa, she and John will live in a house in St. Charles that Samantha and Sean have purchased. The home is a 2,500-square-foot, two-story house valued at $350,000. It has five bedrooms and sits on 20 acres of land. There is an above-ground swimming pool in the backyard and an outbuilding for the children to play in, which includes a "foosball" table, a "ping-pong" table, a basketball hoop, and a batting cage. Samantha testified that the house in St. Charles would be an improvement over the house she sold in Omaha because of the additional space inside and outside the house and because of the activities for the children.

The house near Des Moines would be an improvement in the housing conditions over the house Samantha owned in Omaha and over any apartment that she would move into if not allowed to relocate. This factor weighs in favor of removal.

### e. Existence of Educational Advantages

Another factor to consider is whether Iowa offers educational advantages. This factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Maranville v. Dworak, supra*.

We note that at the time of trial, John was not in school yet and the parties agreed that John should be enrolled in a prekindergarten program for the next school year because he was not ready for kindergarten. Samantha presented some evidence about the prekindergarten program that John would attend if living in St. Charles and some evidence about the prekindergarten program he would likely attend if he stayed in Omaha. She testified that the Iowa school John would attend had an all-day prekindergarten class, specifically for students who could go to kindergarten based on their age, but for whatever reason were not ready for kindergarten. She testified that she was unaware of any similar program in the Omaha area. The school in Omaha that John would likely attend had a prekindergarten program that was half days, 3 days a week. Samantha was worried that the Omaha program would not be sufficient instruction for John.

Samantha also presented some evidence in general about the school districts in St. Charles and Omaha, including average class size. However, the evidence presented regarding each school's scholastic opportunities does not establish any particular advantage of one over the other. Although the prekindergarten program in St. Charles may be more beneficial to John over the one in Omaha, the evidence does not support educational advantages in St. Charles beyond the prekindergarten year.

The trial court did find, however, that the existence of educational advantages factor weighed in favor of Samantha because of the social and familial benefits of John attending the same school as his stepsiblings who will live with him, as well as Samantha's availability before and after school and Sean's involvement in the sports programs in the St. Charles community. We agree. Accordingly, this factor weighs in favor of relocation.

### f. Quality of Relationship Between Children and Parents

This factor does not weigh in favor of or against the move to Iowa. John seems to have a good relationship with both parents. Samantha, as the custodial parent, has been the primary caregiver. Gregory, however, has maintained a close relationship with John, spending as much time with him as he can.

### g. Ties to Community and Extended Family

Given John's young age, he does not have any significant ties to the community. He has not established close-knit friendships, has no tie to a school, and has not been involved in community activities or sports teams, with the exception of playing T-ball one year. As far as extended family, Samantha's parents live in Omaha and she also has a sibling that has children that live in or near Omaha. Gregory does not have any relatives in Omaha. John's minimal ties and limited extended family in Omaha results in this factor weighing in favor of removal.

### h. Likelihood of Antagonizing Hostilities

Prior to the present litigation being filed, the parties had been able to communicate and work together in the best interests of John. After the present litigation was filed, the parties' hostility toward one another increased. However, both parties are devoted parents and both have indicated that they would be able to successfully communicate and coparent once the litigation at issue was resolved. It appears that the parents will act in the best interests of John whether removal is granted or not. Thus, the evidence did not establish the likelihood that allowing or denying the move would antagonize hostilities between the parties. We conclude that this factor does not weigh either in favor of or against the move.

### i. Conclusion Regarding Quality of Life

After considering all of the quality of life factors, we conclude upon our de novo review that Samantha did establish that removal would enhance the quality of life for John or her. Although this is a close case, the scale is tipped in favor of removal when analyzing the quality of life factors.

### (iii) Impact on Noncustodial Parent's Visitation

The third factor for our consideration in the best interests analysis, which the trial court failed to include in its analysis, is the impact the move will have on Gregory's parenting time. This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. See *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). Generally, a reasonable

visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* The frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id.* Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id.*

The drive time between Omaha and Des Moines or St. Charles is not significant, only about 2 hours. Samantha indicated a willingness to comply with a new parenting schedule if she was allowed to move and indicated that she knew it was important for John to maintain his relationship with Gregory. Samantha even suggested that if Gregory was able to travel to Des Moines during the week to visit John, he was welcome to stay at her home. Further, Samantha was asked if she had any concerns about how the summer would work out if John was playing baseball, and Samantha stated that it would be more important for John to spend time with Gregory than to worry about missing baseball. Samantha suggested that exchanges take place in Adair, Iowa, which is about halfway between Des Moines and Omaha.

In allowing Samantha to move, the court awarded Gregory parenting time every other weekend and in the summer from the time school gets out until July 31. The court also gave Gregory parenting time with John on extended weekends that occur during the school year, as well as time over Christmas break and alternating holidays. Gregory estimated that his total parenting time would be about 110 overnights per year, which were about 20 less overnights than what he had under the initial parenting plan.

We conclude that Gregory's parenting time will not be substantially impacted by the move in terms of the overall number of days he has with John. The weekends will remain the same, and the weekday parenting time was replaced by holidays, school breaks, and substantial parenting time in the summer. Gregory will still be able to maintain a meaningful relationship with John. This factor weighs in favor of removal.

### (c) Removal Conclusion

We conclude that the trial court did not err in determining that Samantha's desire to live with her new husband in Iowa was a legitimate reason to leave Nebraska. We further conclude, after considering all the factors involved in the best interests analysis, that the trial court did not err in finding that removing John to Iowa was in his best interests. We affirm the court's decision allowing Samantha to remove John from Nebraska to Iowa.

### 2. MODIFICATION OF CUSTODY

Gregory also assigns that the trial court erred in denying his application to modify custody and award him joint physical custody. Ordinarily, a request for change of custody will not be granted unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009). The party seeking modification of child custody bears the burden of showing such a change in circumstances. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). We conclude that Gregory has not proved a material change in circumstances showing that Samantha is unfit or that the best interests of John require such action. Therefore, Gregory's assignment of error is without merit.

### 3. MODIFICATION OF CHILD SUPPORT

On cross-appeal, Samantha assigns that the trial court erred in using a joint custody calculation to determine Gregory's child support obligation. The original child support was calculated using the sole custody worksheet, see Nebraska Child Support Guidelines, worksheet 1, and set Gregory's child support at $850 per month. Both parties sought a modification of child support. Specifically, Gregory alleged that the parties' earnings had increased and that the Nebraska Child Support Guidelines had changed since the entry of the decree, resulting in a 10-percent or greater change in the child support payment. Samantha alleged that Gregory's income had increased, resulting in an increase of 10 percent or more of the current child support amount.

A party seeking to modify a child support order must show a material change of circumstances which occurred subsequent to the entry of the original decree or a previous modification and which was not contemplated when the prior order was entered. *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999). Evidence of a material change in circumstances warranting modification must be proved at trial and contained in the record on appeal. *Id.*

The trial court found that both parties had requested a modification of child support and that the incomes of the parties had changed materially and substantially since the entry of the decree. The court then found that

> based on a joint custody calculation identifying that the minor child will be in the possession of the mother approximately 225 days and the father approximately 140 days each year [Gregory's] child support obligation to [Samantha] should be reduced from $850.00 per month to $470.48 per month effective September 1, 2011.

The court's calculation for joint physical custody, see Nebraska Child Support Guidelines, worksheet 3, is attached to the court's order.

Samantha argues that the use of a joint custody calculation, worksheet 3, does not comport with the Nebraska Child Support Guidelines. The Nebraska Child Support Guidelines set forth under what circumstances worksheet 3 is to be used in calculating child support:

> When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. When a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court.

Neb. Ct. R. § 4-212 (rev. 2011).

In the instant case, there is no "specific provision for joint physical custody." However, this does not necessarily preclude the use of a joint physical custody child support calculation. Both the Nebraska Supreme Court and this court have recognized that if trial evidence establishes an actual joint physical custody arrangement, courts will so construe it, regardless of how prior dissolution decrees or court orders have characterized the arrangement. *Elsome v. Elsome, supra*; *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012). Where a party proves that joint physical child custody exists, it is error for a trial court to refuse to use a joint custody calculation to determine child support. *Id.* In *Elsome*, there was a detailed shared custody arrangement which generally provided that the children spend 4 days every week with

the mother and 3 days every week with the father. Although there was not a specific provision for joint physical custody, the court found that the actual parenting arrangement amounted to joint physical custody.

Pursuant to the modification order in the present case, the court allowed Samantha to move to Iowa with John and, in doing so, it allowed Samantha to continue having primary physical custody of John, as she did in the initial decree. Gregory's parenting time was revised from that in the initial decree, but he continues to have rather typical weekend, holiday, and summer visitation. Specifically, he was awarded parenting time every other weekend, more than 2 months in the summer, extended weekends during the school year, time over Christmas break, and alternating holidays. The trial court found that this would amount to approximately 140 days of parenting time per year for Gregory. Gregory, however, estimates that his modified parenting time amounts to 110 days per year, which he states is about 20 less days than he had under the initial parenting plan.

Although the exact number of days of Gregory's parenting time is uncertain, it will be between 109 and 142 days per year as referenced in § 4-212. However, his parenting time does not amount to a joint physical custody arrangement. Rather, the arrangement is clearly one of Samantha having primary physical custody and Gregory having parenting time, just as it was under the initial decree. Accordingly, there has been no material change in circumstances in the custody arrangement to justify shifting the child support calculation to one based on joint physical custody.

Thus, the trial court erred in using the joint custody worksheet to calculate Gregory's child support obligation. We reverse the trial court's child support calculation and remand the matter to the trial court with directions to recalculate Gregory's child support obligation using the parties' current incomes and the sole physical custody worksheet, worksheet 1.

## VI. CONCLUSION

We conclude that the trial court did not err in granting Samantha permission to remove the parties' child from Nebraska to Iowa and did not err in denying Gregory's complaint to modify custody. Those portions of the trial court's order are affirmed. We further conclude that the trial court erred in using a joint physical custody calculation, worksheet 3, to determine Gregory's child support obligation. Accordingly, we reverse the trial court's child support calculation and remand the matter to the trial court with directions to recalculate child support using the parties' current incomes and the sole physical custody worksheet, worksheet 1.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.